# Illinois Commercial Men's Association v. Florence Tinsman.

## Gen. No. 13,619.

1.  LIFE INSURANCE—*when "due diligence" clause not violated. Held,* under the evidence in this case, that it was for the jury to determine whether the insured at the time of his death was "in the exercise of due diligence" for his self-protection, and that there

appeared no reason for interfering with the jury's verdict on that
question.

2. LIFE INSURANCE—*effect of "due diligence" clause.* The follow-
ing excerpt applied by a Massachusetts court to a clause similar to
that involved in this case, is quoted with approval:

"The phrase is very general and certainly it does not mean that
the assured must guarantee himself against accidents; nor do we
think it means that he shall not recover for any accident to which
some want of care on his part may have contributed. He is not re-
quired to use all possible diligence, but only all due diligence. The
due diligence or care is sometimes said to be the ordinary care of
prudent persons. It is not a precise term, but a relative one. In
an accident policy it would not be reasonable to hold that this
clause requires of the assured a higher degree of diligence than
prudent persons are accustomed habitually to use. Under such a
construction few persons would care to have an accident policy.
The due diligence required is not inconsistent with inadvertence
nor with running such risks as prudent and cautious persons ha-
bitually run, and upon the evidence the act of the deceased was
not necessarily to be deemed a violation of this provision."

3. LIFE INSURANCE—*test as to whether "due diligence" clause has
been observed.* Whether the insured has observed the "due dili-
gence" clause of an accident life insurance policy is to be determined
from a consideration of all the circumstances, surroundings and
obvious conditions which go to show that he must in the exercise of
ordinary prudence have appreciated or on the other hand might
reasonably not have appreciated the danger which confronted him
at the time of the accident which resulted in his death.

Assumpsit. Appeal from the Superior Court of Cook County;
the Hon. ROBERT W. WRIGHT, Judge, presiding. Heard in this court
at the March term, 1907. Affirmed. Opinion filed March 9, 1908.

Statement by the Court. This is an appeal from a
judgment of the Superior Court of Cook county, in favor of
the appellee, who was plaintiff below, against the appellant,
who was defendant below, for $5,540.41.

The judgment was in an action on an accident insurance
policy issued by the defendant, the essential parts of which
were as follows:

"In consideration of, etc.,    *    *    *    The Illinois Com-
mercial Men's Association does hereby receive    *    *    *
Frederick W. Tinsman    *    *    *    as a member of said

Association, and upon the further consideration and upon the condition of the payment, etc., ·\* \* \* there shall be payable to said member in the case of an accidental injury not resulting in death and within ninety days after the receipt by said Association of satisfactory proof of the happening of such injury, the sum, etc. \* \* \*; and in the case of the accidental death of said member there shall be payable to Miss Florence Tinsman, sister, of Chicago, Ill., if living at the time of such accidental death, otherwise to the legal representative of said member within ninety days after the receipt by said· Association of satisfactory proof of the happening of said accidental death the sum of $5,000. And any and all such payment or liability to pay shall be and is in accordance with and subject to each and all of the provisions of the by-laws of said Association and of the provisions of any and all amendments, alterations and new issues of said by-laws, which said by-laws are hereby referred to and made a part hereof as fully as if they were recited at length over the signatures hereto affixed, \* \* \* and the said Frederick W. Tinsman hereby and by the acceptance hereof agrees to abide and be bound by said by-laws and each of them, and by any and all lawful amendments, alterations and new issues thereof, or of any of them \* \* \* this 19th day of March, 1904.

GEO. W. SMITH,<br>President."

Section eight of article 7 of the by-laws of the Association was partly as follows:

"This Association shall not be liable to any person for any indemnity for injuries or death or loss of limb or of eye resulting from an accident to a member which happens while said member was violating any law, *was not in the exercise of due diligence for his self-protection;* or was in any degree under the influence of intoxicating liquors. \* \* \*"

Frederick W. Tinsman lost his life by drowning May 15, 1904, while attempting with three other persons to cross the Truckee river in Nevada, on a trolley-cable ferry, as hereinafter in the opinion described.

The defendant company refused to pay to the plaintiff, Florence Tinsman, the five thousand dollars stipulated in the policy as the death indemnity, and she brought suit. The company pleaded the general issue and two special pleas. These special pleas set up article 7 of section 8 of the by-laws of the company before quoted, and alleged that Frederick W. Tinsman was not in the exercise of due diligence for his self-protection at the time of the accident. The first special plea specified his default to be that he attempted "to cross a certain running stream of water by means of an unsafe and dangerous appliance or unsafe and dangerous appliances, and that the unsafe and dangerous condition of said appliance or appliances was known to said Tinsman, or might have been known to him by the exercise of ordinary care and caution for his safety and well being."

The specification of the second special plea was that "he attempted to cross a certain running stream of water known as the Truckee river, by means of a certain appliance or car attached to a cable, when the water was high and the current swift and it was dangerous and unsafe for any person to cross said stream in such manner at the time, and that the danger was known to Frederick W. Tinsman, or might have been known by the exercise of care and caution for his own safety."

The cause was submitted to a jury. All the material facts were stipulated except the details of the manner in which the insured met his death and the surrounding circumstances tending, in the opinion of the parties, to throw light on the question whether or not he was in the exercise of due diligence for his self-protection at the time of the accident. Testimony as to such details and circumstances was offered by both parties in the form of depositions by persons residing in the vicinity of the place where the accident happened, or who were there present on the occasion of it. Different but not materially differing depositions of the same persons were offered by the parties respectively.

At the close of the plaintiff's testimony and again at the

Illinois Commercial Men's Ass'n v. Tinsman.

close of all the testimony, the defendant asked for a peremptory instruction, which was refused.

The trial judge gave to the jury three instructions at the instance of the plaintiff and thirteen at the instance of the defendant, but refused to give five which were asked by the defendant. The jury returned a verdict for $5,540.41, which was the amount of the insurance indemnity contract with interest at 5 per cent from the date of the *præcipe* to the date of the verdict.

A motion for a new trial and a motion in arrest of judgment were overruled by the court and judgment was given on the verdict. This appeal followed, and the assignments of error argued in this court attack the rulings of the trial judge in refusing the peremptory instruction asked for, in giving the second and third of the instructions tendered by the plaintiff, in refusing each of the five refused instructions tendered by the defendant, in refusing to grant a new trial, and in entering judgment on the verdict.

JAMES MAHER, for appellant.

DOUGLAS C. GREGG, for appellee; DUNCOMBE & EVANS, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

The sole question presented by this record for us to decide, is whether we can say as a matter of law that the evidence shows that Frederick W. Tinsman was not "in the exercise of due diligence for his self-protection" at the time he met his death. If we cannot so say—if under the evidence it was a question of fact whether or not Tinsman was in the exercise of due care—then it was properly left to the jury to answer, and with that answer we find no reason to interfere on account of the rulings on instructions or otherwise. In other words, under the evidence in this case, we deem it apparent that if there were no error in refusing by peremptory instruction to take the cause from the jury, there

was none in refusing to allow, on the ground that the verdict was against the preponderance of the evidence, the motion for a new trial. Nor do we think that the instructions under which the question went to the jury were erroneous, if the question was one for the jury. We will briefly advert to them after we have stated the facts as shown by the evidence.

Tinsman on May 15, 1904, was about thirty years old, unmarried, president of a trading business corporation of Chicago, of at least average intelligence and judgment, not given to recklessness in conduct, temperate in his habits, and not under the influence of stimulants at the time of the action which resulted in his death. He was, with a friend two or three years older, traveling in the West in the interests of the Chicago Art Company, of which he was president. They had left Chicago, March 23, 1904, and on May 15th were camped at Laughton Springs, Washoe County, Nevada, about thirty yards from the Truckee river, on the north side thereof. The place appears to be an "amusment resort." It is about five miles west of the city of Reno. There are three hot springs there, and just east of the springs a grove used for picnic parties chiefly by the people of Reno. A Mr. Laughton had a residence and a barroom there, and there were farm and outbuildings there.

Mr. Dunlap, Tinsman's friend, had carried out from Reno a tent and some camping supplies, and had been there some days when Tinsman joined him. This was on Friday, May 13th. Dunlap and Tinsman were planning for a business trip in northern California, and expected to make it also a camping trip. For this they were intending, at this Laughton Spring camp, to overhaul the camping, hunting and fishing utensils and remodel a wagon which they were to purchase at Reno. The stream, which varied in size according to the melting of the snow in the mountains, but was normally six or seven feet deep, was about 200 feet wide at the time of the accident. There was no bridge across the river nearer than a mile and a half by the road, but at low stages of the water there was a feasible wagon ford near the place,

about 600 feet from the camping ground of Tinsman and Dunlap; and at about the same place, for use when the river was above this low stage of water, the trolley cable ferry on which Tinsman made his fatal attempt to cross the river. Mr. Laughton, who owned the land about there and managed the "resort," had a farm which lay on both sides of the river, and, as we understand his testimony, had up to twelve or thirteen years before, when the river was too high to be forded, used for ferriage a boat attached to a wire cable stretching across the river. At that time, however, some change in the river formed a bar, and he altered the method of transportation (which was, as he says, only for the purpose of carrying the produce of his farm and the people who worked for him across the river) to a car strung between two wire cables. These wire cables were about 210 feet long. One was a ⅞-inch and one a ⅝-inch cable. On one side of the river they seem to have been fastened by bolts drilled into a rock on the bank, on the other attached to wooden structures on the bank loaded down with stone. Each of these cables passed through a pulley at each end of one side of a car, which consisted of a platform about ten feet long and four feet wide, with cross-pieces—four by fours—at each end. Thus each cable passed through two pulleys on the respective sides of the car, and the car swung between the cables, which were four feet apart. The bottom of the car was, according to the evidence, from four to eight inches below the cables. Different witnesses made different statements about this measurement. At the banks of the river, when the river was at its normal height, the car was about six feet above the river. The method of its operation was to loosen it from its fastenings to the shore, to allow it to run by its own weight on the naturally sagging cables to a point midway between the banks, and then to pull it hand over hand up the slightly inclined cables to the opposite bank. At the middle of the river the car would still, in a normal or average state of the water, be at least three or four feet above it. A windlass arrangement on the north bank was

attached to the cables to tighten them when they had loosened and sagged too much through warm weather or otherwise.

The car has been thus used for twelve or thirteen years without serious accident, or mishap, as many as four and sometimes more people often passing over in it. The proprietor, Mr. Laughton, said that 700 pounds had often been carried on it and was a fair load for it. He also said that it was a safe method of crossing the river unless the water was too high, when he regarded it as unsafe. It would appear that although not primarily intended for the use of the public, or of anybody but Mr. Laughton's family or employees, it was often used by other people, people fishing in the river, picnic visitors to the Springs, and the like; locks on it being sometimes broken to allow its use, and notices put up forbidding its use frequently being unheeded.

On the 15th day of May the Truckee river had been rising for two or three days. Just how great was the rise it is impossible to tell from the evidence, but it was evidently very considerable, although impressing different witnesses differently. Those living near and familiar with the river considered the rise remarkable, it would seem. Thus the proprietor of the resort, S. L. Laughton, swore the river was "as high as he ever saw it"—"running wilder than he ever saw it before or since." He said on the following day it fell from six to eight inches. Again he says, "The water was low on the day before (May 14th) as compared with the water" on the 15th. "The river raised very rapidly—from four to six inches an hour." So the undertaker at Reno says the river was running very high, that it was "higher than he had ever seen it." Mr. Walton, a witness residing at Reno, says, "The river was very high, running very fast." James D. Andrews, another resident of Reno, says, "The river was the highest I ever saw it." On the other hand, Mr. Dunlap says that he saw persons crossing on the car three or four days prior to the accident, and to the question, "At the time you saw persons cross over that river in this car, which you have just referred to, what was the difference, if any, between the height and volume of the water in the river and that of

the 15th of May," he answered: "They were practically the same, possibly a little difference one way or the other." On cross-examination he was asked, "While you were there was the water in the stream always the same, or was it less in the morning than at night, or otherwise," and answered: "Well, it probably varies according to the melting of the snow."

"Q.   Exactly?   A.   Sometimes a few inches higher or lower.

Q.   Yes.   A.   I did not observe that so much prior to the accident as I did afterwards.

Q.   Exactly.   A.   But I ascertained by marking the stream that it would raise and lower according to the amount of snow melting in the mountains.   *   *   *

Q.   What was the condition of the river at this particular point where the cable crosses?   A.   It was running smoothly under this car, and for perhaps 150 or 200 yards below the car and probably a like distance above the car.

Q.   The water was not rough?   A.   No, sir.

Q.   And turbulent?   A.   It was not at that point that the car crosses.

Q.   Was it above or below?   A.   Both above and below.

Q.   But at this particular point you say it was smooth? A.   It was smooth there—comparatively so—as a river can be through a mountainous country."

Mr. Walton, a witness for both parties, says: "The river at that time was running very fast and it was very high. *I noticed it, because by throwing a stick into the river—the dog—I had my dog with me—went out, and I came near losing my dog at the time because if he had got down below, he couldn't have got out."*

We think there is no reason to doubt the good faith of any of these witnesses.   As the event proved, the river was so high that it was dangerous to cross it in this car; but the fact that it was unusually or dangerously high or running unusually rapidly might well not have been obvious to persons unfamiliar with its average and normal flow and depth.   It seems to have required a peculiar incident to call it especially

to Mr. Walton's notice even, although he lived near it.     This consideration we deem of some importance in the cause.

During the forenoon of May 15th two boys, and afterwards three, had crossed the river in the car.     Mr. Walton, who saw them, thought the car touched the water in the passage, but no accident resulted, and it did not strike him as so dangerous but that the question of going over himself with his wife and friend in the car was mooted, and abandoned for other reasons, but apparently without consideration of its danger. Two hours later, between one and two o'clock in the afternoon, Tinsman met, near the bank where the car was fastened, a Mrs. Ede and a young man named Jacobs, and a young woman with him named McMillan, all of whom lived in Reno and were apparently visiting the Springs on a Sunday outing.     What conversation occurred between them cannot be known, but a man named Morris, who was a ditch tender in the neighborhood and happened to be in the vicinity, saw them talking, and Tinsman untied the car and went on it with Mrs. Ede.     The young man, Jacobs, followed, and, after some reluctance, Miss McMillan.     The car ran down towards the middle of the river—the cables so sagged that in the then condition of the water the car struck the rapidly flowing current at some point between the shores (60 feet from the bank, the eyewitness Morris says at one place in his testimony, making it less in another; "midway" of the river, if S. L. Laughton's deductions from the position of the broken car after the accident were correct), the car was broken, the people in it all swept out in the river, and despite frantic efforts by themselves to stem the current of the river, and attempts to save them made by people who saw them struggling, they were all drowned.

These facts were placed before the jury in the trial below, and it was left for them to say, under the instructions given to them by the court, whether Tinsman was "in the exercise of due diligence for his self-protection" when he lost his life.     They were told that the mere fact that he lost his life in a manner which might have been avoided should not in itself be taken to prove that he was not in the exercise of due

diligence for self-protection, but that "the exercise of due diligence for self-protection" meant such a degree of care for his self-protection, under the circumstances and in the situation in which he was placed, as an ordinarily prudent man would exercise under like circumstances and in the same situation. They were also told that the burden of proof was on the plaintiff to establish the proposition that the insured was at the time of his death in the exercise of due diligence for his self-protection—a proposition of doubtful accuracy perhaps, but which certainly did not militate against the rights of the defendant.

Under these instructions the jury returned a verdict for the plaintiff. As we have before indicated, unless we are prepared to say that the peremptory instruction taking the case from the jury should have been allowed, we see no justification in the evidence for holding the verdict against its clear preponderance.

If it was for the jury to say whether the insured was in the exercise of due diligence for his self-protection, we see nothing in an analysis of the evidence which forbade them to find that he was. That he was not invited by the proprietor to use the trolley car, and that the proprietor did not wish strangers to unfasten or to use it, does not seem to us, in view of the circumstances of its frequent actual use, at all material. This is not an action against the proprietor. The question is simply whether a man of ordinary prudence would have necessarily deemed it dangerous to use the car that afternoon. With this question, we cannot see that the license or prohibition of the proprietor has anything to do.

The clause in question, "In the exercise of due diligence for self protection," does not materially differ from the phrase which engaged the attention of the Supreme Judicial Court of Massachusetts in Keene, Admx., v. New England Mutual Accident Association, 161 Mass., 149. There the policy required the insured "to use due diligence for personal safety and protection," and, reversing a decision by the Superior Court, which was that under the circumstances of that case it could be held as a matter of law that the condition

had not been complied with, the Supreme Court of Massachusetts said the question was for a jury, and used these words—very applicable, we think, notwithstanding the very different facts involved, to the case at bar: "The phrase is very general and certainly it does not mean that the assured must guarantee himself against accidents; nor do we think it means that he shall not recover for any accident to which some want of care on his part may have contributed. He is not required to use all possible diligence, but only all due diligence. Due diligence or care is sometimes said to be the ordinary care of prudent persons. It is not a precise term, but a relative one. In an accident policy it would not be reasonable to hold that this clause requires of the assured a higher degree of diligence than prudent persons are accustomed habitually to use. Under such a construction few persons would care to have an accident policy. The due diligence required is not inconsistent with inadvertence nor with running such risks as prudent and cautious persons habitually run, and upon the evidence the act of the deceased was not necessarily to be deemed a violation of this provision."

In a case involving a different provision in a policy, as well as a very different state of facts, the Supreme Court of Pennsylvania also used language which states a principle of general application to cases like the present, which well expresses our views: "A clear distinction exists between a voluntary act and a voluntary exposure to danger. Hidden dangers may exist, yet an exposure thereto, without any knowledge of the danger, does not constitute a voluntary exposure to it.    *    *    *    The result of the act does not necessarily determine the motive which prompted the action; the act may be voluntary, yet the exposure involuntary. The danger being unknown, the injury is accidental." Burkhard v. Travellers Insurance Company, 102 Pa. St., 262.

In the present case the danger certainly existed—the event proved it—but that the insured "in the exercise of due diligence for his own protection"—that is, acting as any ordinarily prudent man would have acted under the same circumstances — would have avoided it, is an entirely dif-

ferent proposition.   Whether it is true depends on all the circumstances and surroundings and obvious conditions which go to show that he must, in the exercise of ordinary prudence, have appreciated, or, on the other hand, might reasonably not have appreciated, the danger.   These circumstances, surroundings and conditions being placed before the jury by the evidence, it was for them to answer the question involved. No better criterion for such a determination than the common sense of the average man can be found.

Among these circumstances and conditions placed before the jury, and well illustrating the factors which might properly determine their verdict, was the alleged conversation between S. A. Laughton, Tinsman and Dunlap, on the morning of the accident, in which Laughton says he "told them it was hardly safe for a person to cross, the water was so high." Dunlap positively denied that such a remark was made.   It was for the jury to decide whether or not such a remark was made in Tinsman's hearing.

Appellant complains, however, that two of the instructions given were erroneous, and that the refusal to give several tendered by it was unwarranted.   We have carefully considered all the instructions tendered, and we think that the jury were instructed more favorably to the defendant than was entirely justifiable.   Besides the doubtful accuracy of the instruction concerning the burden of proof, the third instruction given for the plaintiff, if taken by the letter, makes a verdict for the plaintiff dependent on the belief of the jury that any other reasonably prudent man under the same circumstances would have attempted to cross the river, etc.— manifestly, it seems to us, a less precise statement of the law, taking words in their common meaning, than if it had said that they must believe that other reasonably prudent men *might* have so attempted to cross the river, etc.   It is the use of the word "might" in the first half of the instruction of which appellant complains; but this word is used only in the clause which tells the jury what they may consider, not in that which states on what their verdict must depend.   The instruction might have been better worded, but we do not

thing it erroneous. It could not but be construed by the more precise language of instructions 6 and 10, given for the defendant, which fully and accurately state the law; and it could not, we think, have misled the jury.

There is nothing in the other objections to the rulings on instructions which needs discussion. The second instruction given for the plaintiff could not have been in reason understood by the jury, as counsel contends it might have been, to refer to Tinsman's struggles in the water.

The first four of the five refused instructions are plainly covered by instructions which were given, and the fifth, as it appears in the record, plainly should not have been given. There was clearly some clerical error in drafting or transcribing it.

The judgment of the Superior Court is affirmed.

*Affirmed.*